Please rest. The court is now in session. Please be seated. Would the clerk call the next case please? Case number 316-0463, County of Will, account by Joshua Vincent and waste management account by Donald Mann versus Illinois Pollution Control Board by Valerie Quinn, Environmental Recycling and Disposal Services by George Mueller and Village of Rockdale by Michael Skid. Thank you. Mr. Benson, good morning. Good morning. May it please the court, Joshua Benson on behalf of Will County, a different client for me to usually represent in front of this court. We're going to be splitting our issues, Mr. Moran and I. I'm going to do what I'll refer to as the public notice and special condition issue, and Mr. Moran is going to do the manifest weight issue. With respect to the public notice issue, I think the question that's before the court is, does a public notice of a hearing on a siting application for a waste transfer station have to accurately state the volume of waste that it's going to process? And I think, I don't see how there can be any answer other than yes, it must. And this is from a standpoint of statutory construction when you look at section 39.2b in the notice provision. Among other things, it has to say the nature and size of the development, and this notice did specify that it was a waste transfer station on 2.16 acres, and I think that's satisfactory. But it also has to state the nature of the activity proposed. And that's really, I think, the focus of the argument today is the nature of the activity proposed, because the volume of waste that a waste transfer station processes drives the entire analysis. How can it not be essential in the public hearing notice? In that category, what the applicant provided was that it was going to be specified no hazardous waste, nothing like that, just basic municipal solid waste, and it said an average of 200 tons per day. Now, we contend that that was inaccurate and misleading, but their response is that that 200 tons per day provision was surplusage. Now, first of all, that notice was prepared by Mr. Mueller, who is probably one of the most experienced practitioners in this area, I can imagine. I don't know why he would include something like surplusage in a notice like this. But more importantly, when you look at what happens at the hearing on the siting application, what drives everything? When you talk about operational safety, when you talk about traffic, when you talk about wastewater management, what's going to happen if there's a storm, and is Nietzsche going to get out of this facility? What does it all depend on? Are there going to be accidents? Are there enough safety personnel? It all depends on the volume of waste that the facility is processing, because that determines how many trucks are coming and going, how many trucks are being loaded and unloaded every hour, right down to the minute. They're calculating all of these things. So I don't see how anyone with a straight face could stand here and tell you that that is surplusage, and that when you talk about the nature of activity at a waste transfer station, that the volume of waste that it processes doesn't matter. Of course it matters. It's absolutely essential. And the problem that we have here is it was inaccurate and it was misleading, because when you look at the record, you'll see that the hearing notice says an average of 200 tons per day. And then we look at the siting application. What does that say? On one page, I think it's page 45 of the record, the siting application says approximately 200 tons per day. Okay, maybe not a big variance there. But then five pages later, at page C53 of the record, it says initially 200 tons per day. So we've gone from an average to approximately to initially, pretty significant change there. And then what happens, there's nothing else in that siting application that talks about the tonnage until you get now to the hearing. And what happens at the hearing? They bring in an expert, this Mr. Hock, and you look right at his PowerPoint presentation, and you look at the calculations that are being done, and it's all 600 tons per day. That's what it's all being determined about. And when he's questioned even more closely about that, it becomes, well, we can easily handle 600 tons per day. We can probably handle more. We may be able to handle 2,200 tons per day, and we don't think there should be any limit whatsoever on how much this facility can process. This is like Pinocchio's nose. It just got bigger and bigger and bigger. And I think from the standpoint of what is in the public interest, from what the public policy that this court should make clear is that a hearing notice, a notice of a public hearing on a siting application certainly should state the volume, accurately, the volume of waste that's going to be processed at the facility. Under the MIG investments case, the government, the local government, has to be able to assess the impacts that this facility is going to have on the community. And if the notice is misleading and does not accurately state that, that can't be determined. So I think that's a pretty cut-and-dry problem we have here. And if the notice is inaccurate and misleading, then the village does not have jurisdiction to conduct the hearing in this case. I have a couple of questions, Mr. Vincent. Sure. The notice of public hearing is to advise people that there's going to be a hearing and the general parameters of what's going to be discussed. And within the public notice in this case, it said we're going to be preparing a siting agreement that will be available for people to inspect before the hearing. There's also reference, and I can't remember exactly where it is, to a hosting agreement, a host agreement with Will County. And in that host agreement, it says that Will County, that ERDS, E-R-D-S, will be paying Will County a certain amount of money for every ton over 600. Correct. So where does the requirement for actual specificity fall? Is it the combination of all these documents? No, I think the requirement for some specificity falls right within the notice of public hearing because that notice goes out to the state representatives. It's going to make its way into the media. It's going to make its way to the public. And those are the people that have to assess what kind of an impact is a facility like this going to have on our community. And so I think that's where it has to be. If the siting application isn't done yet, how does the public notice include all of that specificity? Well, I think the siting application is submitted 14 days after the public notice. So I think that that had to have been prepared in advance at the time that the public notice is issued because that's what the statute requires is 14 days advance notice. So the siting application, which I believe is about 800 pages long, had to have been prepared at that moment in time when that notice is given. That's the only way I think that they would know it. So I do think that that's the only way the public finds out. My time is very limited. I want to talk also about my time's up. Sorry. May I ask one question? Certainly. Do you think the notice limiting it to an average of 200 per day, is it your contention that that was an unintentional underestimation or a deliberate misrepresentation? Keeping with the public policy argument that you're espousing, right? You know, I think that the way I read that notice, that public notice, I felt that it deliberately downplayed the nature of this facility. Is it because within two weeks they were saying it's going to be 600? I think that's one reason. But I also think that it was couched in terms to not hit anybody's radar. Okay? It's all over the place in terms of there will be no hazardous waste, no medical waste, no kind of waste that, you know, anybody would find worrisome or objective. And on a small scale that it's no big deal. That's right. And I think it was calculated. I don't know if I want to say deliberate.  And I think it was calculated to fly under the radar. And once they get to the hearing, it becomes another number. So 200 tons per day, I assume it comes in by truckload? Yes, I believe it does. I think it comes in both. And then goes out because it's transferred? Yeah, I think it comes in in both packer trucks and trailers. What is your understanding of the record? How many trucks carry 200? And then I would multiply that times three. That would probably be a better question for Mr. Moore. Okay. Thank you for asking. Who was at the hearing and I was not? Thank you for asking. Okay. Thank you. Mr. Moran, good morning. Good morning, and may it please the Court. My name is Donald Moran. I'm here on behalf of Waste Management of Illinois, Inc. With respect to the pre-filing notice issue, which Mr. Vincent was just addressing, that notice has been determined by the courts in this area as being probably one of the most critical documents that is filed that triggers this site approval process. The public hearing that's held is the most critical portion of this entire process. And the notice that is filed, and it's a pre-filing notice. It's not a notice of public hearing. It's simply a notification to the public that an application will be filed at least 14 days after the publication of the notice. And the statute requires that certain specific aspects and dimensions of this proposed facility be identified, including the nature and size of the facility. That's critical because in order for a member of the public or a state representative or anyone else who may consider whether they wish to attend or participate in the hearing, that description has to be accurate to the letter. And if it isn't, the courts have determined that any defects in that pre-filing notice is jurisdictional. That is, the local unit of government will never obtain jurisdiction to consider the siting request unless there is strict, not substantial compliance with that pre-filing notice requirement. And in this instance, you had a situation where the applicant was indicating that their facility was going to be one size. That is, they were going to accept approximately an average, let's say, of 200 tons per day, when in fact what we learned at the hearing was that that amount was going to be much higher, as much as three times higher, maybe even four or five times higher. Well, did they say they were going to take that much, or did they say the facility would be capable of handling that much? They indicated that the facility would accept an average of 200 tons per day. Okay, but I'm saying at the hearing, was the testimony, well, no, but we are going to be accepting 600 tons a day, or was the testimony that this facility was capable of handling 600 tons a day? Well, it was during my cross-examination with Mr. Haack that I first learned that the applicant was, in fact, intending at some point to receive greater than an average of 200 tons per day. It came up in connection with questions about what this facility would indeed be processing, and Mr. Haack began speaking and indicating that, indeed, it was the intent not only for the facility to accept more than 200 tons per day, but up to four, five, 600 tons per day, 1,000 tons per day, and then ultimately he said, look, this facility is capable of basically handling an unlimited amount of waste, which, frankly, was the first time I had ever become aware of that fact in looking at the application and all the testimony up to that point. So the initial statement in the pre-filing notice was that this facility would accept an average of 200 tons per day. We learned in the testimony that that was wrong. Following up on Justice Schmidt's question, does the case law allow testimony to cure any deficiencies in the notice? No, it does not. Can you give me a specific case? The cases basically will address, and this is the Dobbs case, the Brown and Ferris Industries case, saying that the notice that is presented and served and published must comply with all the requirements in the Environmental Protection Act describing the nature and size of that activity and that if there are any errors in that description, the defect in the notice is jurisdictional and the local unit of government... So harmless error doesn't apply. Harmless error does not apply. It was discussed at the hearing, but in order to get to the hearing the notice has to be... Yes, strict compliance is required. The Dobbs case did address a situation where there was both a legal description which was wrong and a narrative description of the location of the facility. So there was indeed a correct description of the location of the facility even though the legal description was wrong and would place the facility six miles from the actual location. So the court there determined, yes, there was strict compliance because the narrative description was sufficient and was adequate. I wanted to address the question of the criteria and the pollution control board's review of that evidence. What happens when the pollution control board does not conduct in a citing appeal the review prescribed by our Supreme Court in town and country utilities? What occurs is a rubber stamp affirmance. And a rubber stamp affirmance is not what the legislature intended when it created a critical role for the pollution control board in the site location appeal process. Here, the pollution control board did not conduct that review that the Supreme Court prescribed in town and country and in fact simply deferred to the village on all legal and factual issues related to the criteria. As explained by the Supreme Court in town and country, section 40.1 of the Illinois Environmental Protection Act requires the PCB's technically qualified members to conduct a hearing to examine the record evidence and to make factual and legal determinations on the evidence. Thank you. In this instance, the PCB did not conduct that examination of the evidence but merely recited or summarized the record evidence and then deferred to the village on all issues relating to the property. There are tests to be applied in determining whether the criteria were met and also to any record references or factual issues as they related to the criteria. For example, with respect to Criterion 1, the Meme Criterion, the standard that has been established for well over 30 years is that an applicant must produce evidence showing the amount of waste generated in a service area, the available disposal capacity and transfer capacity available to that service area, and then to determine whether there is any shortfall in either that disposal capacity or transfer station capacity so that the transfer station could be determined to be needed. Here, there was no such evidence presented. The applicant did not present any transfer station capacity analysis, no disposal capacity analysis, and as a result... Let me ask you this. So is it your position that there isn't another transfer station needed in Will County? That's correct. So where is this 600 tons of waste going to come from a day if the other stations are handling it all? The evidence in this record established that the amount of waste being generated in the service area varied between 2,300 and 3,700 tons per day. The Prairie View Landfill, which is located in Will County, is capable of accepting and handling all of that waste generated in the service area. For a transfer station to be needed, generally what the transfer station provides the service area is access, access to landfills. Where a county such as Will has a landfill that's reasonably convenient and available to handle all the waste generated in that service area, there can be no need for a transfer station. Here, not only... For Will County waste? For the Will County service area waste, correct. So is it possible the waste is going to come from beyond that service area? It's possible that there may be waste coming in from beyond the service area, but if that's the case, then this service area is not obligated and does not need a facility to handle that out-of-service area waste. That's one of the key points. The other key point is that in addition to the Prairie View Landfill, there are two permitted waste transfer stations capable and authorized to accept municipal solid waste, which this proposed facility proposes to accept, within a mile of this proposed site. Two transfer stations, the Joliet Transfer Station, which is currently handling 1,200 tons per day and is capable of handling an additional 600 tons per day, which happens to be the amount of waste ultimately that this applicant is going to seek to approve to receive. In addition, the Rockdale Transfer Station is also permitted to receive municipal solid waste. It's located two blocks away. At this time, it is not accepting any municipal solid waste because there isn't municipal solid waste that needs to be transferred or processed through that facility. That fact, the Prairie View Landfill, the Rockdale Transfer Station, which is not accepting any municipal solid waste, even though it's authorized to do so, and the fact that Joliet has the capacity for an additional 600 tons per day of municipal solid waste establishes that there could be no need for this proposed facility. Thank you. Thank you very much. There is nothing in the language of the Act or the case law that requires throughput in a prefiling notice. This notice was accurate. It described the nature and size of the development, which is a physical aspect, and it described the nature of the activity, which was, and I quote, accepting non-hazardous waste for temporary storage, consolidation, and further transfer to a waste disposal treatment facility. That's at 1475 of the record. That right there is the nature of the activity, and it would be different if ERDS had proposed in its application, for example, to handle hazardous waste, liquid waste, or to do something other than what a transfer station does, such as storing it or burning it, but that's not this case. The application states an average of 200 tons per day. That was sufficient to put interested persons on inquiry if they had any concerns about the proposed development. The application itself analyzes 200 tons per day and 600 only because that's the number that appears in the list agreement with Will County as the trigger point for host fees. The applicant stated, and it comes out in the PCB portion of the hearing, they never meant to get up to that amount. They simply designed one that could safely handle that amount, and that is also because when IEP issues permits for these facilities, it doesn't specify or limit a throughput. So this transfer station was simply asking for the flexibility that every other transfer station enjoys. What about the appellant's argument that there's case law that requires that this be absolutely accurate? It has to be sufficient. I believe it's in the Tate case. I think there are certain cases cited in my brief. I believe it's Tate. What's necessary is that there's enough accurate information in the pre-filing notice to put anyone who may have a concern on inquiry, and if they are concerned, they can go and read the application, attend the hearing, and satisfy themselves about what is going on. But there is nothing that requires a number. In fact, I think, as I recall in the Roxanna case, I don't believe the applicant there specified any throughput at all. It's not necessary. Now, the villager explicitly stated that this applicant met criteria 1, 3, 4, 6, 7, 8, and 9, and it met 2 and 5 subject to conditions. It explicitly found that the criteria were met. On the criteria, it's a matter of the standard review is, were the villagers' findings against the manifest weight? And that is the review that the PCB conducts. The PCB's role in a citing appeal is to look at the village's decision, look at its findings, and determine whether its findings were against the manifest weight of the evidence. And then this Court reviews the PCB's decision using the same criteria. It's kind of unusual because it's double manifest weight. To overturn factual findings, this Court would have to determine that no rational fact finder could have come out the way the PCB did. And that is precisely the analysis that the PCB has to apply to the village's decision. There's a 40-page decision in this case. The analysis starts at page 18. The Board doesn't re-weigh the evidence. It examines it, it looks at the party's arguments, and it makes its decision. And that applies to all nine criteria. Now, the village found that this transfer station was necessary. Waste management attacked the competency of Mr. Hock's testimony. But competent evidence is evidence that is legally admissible and tends to prove the matter in dispute. This was competent evidence. Mr. Hock was an expert just like everybody else. It's a classic battle of the experts here. In insisting that waste transfer stations are only necessary when the local landfill is about to close, waste management is contradicting the testimony of its own witness, Kurt Nabel, who said, no, there are efficiencies here. There's a reason why we have transfer stations. It is more efficient for collection trucks to dump their load at the closest facility and get back on the route. And if you adopt the premise that transfer stations are only necessary when there's a year or so of life left for the landfill, then by that logic, Joliet Transfer Station isn't necessary either because it goes to the closest landfill. Furthermore, this applicant did address the waste production and disposal capacities of its service area. You can find it at a minimum in the application at C53-66, in the testimony at 2604-2618, and that's just the direct because he was cross-examined extensively on this topic. Unsurprisingly, Mr. Hawk concluded that Prairie View has the capacity for about the next 15 years or so. Pretty much their expert's conclusion as well. But that traditional method of determining the need for a landfill is not mandated by the plain language of the Act, and it may have a limited application to other types of facilities that do not serve as a final disposal site for waste. Transfer stations are kind of new, and they serve not only to extend the life of landfills in some cases, but they save fuel, emissions, money, road wear, and truck wear. And even their expert agreed that the local transfer stations can't handle everything that is generated in the service area. And I think it's important to bear in mind that what's proposed here is a pollution control facility pursuant to the Environmental Protection Act. There is unrebutted evidence in the record that siting this transfer station will save something like 90,000 to 130,000 truck miles driven each year, reduce fuel usage by about 40,000 gallons per year, and reduce CO2 emissions by about 600,000 pounds per year. And that is, I could give page sites if the court wants it, but that is in, it's in the record, and there's just no way that reducing emissions and fuel usage can't be relevant. That controls pollution. How much time do I have left? Two minutes. Two minutes. Okay. Does the court have questions? We're usually not shy when we do. Okay. All right. Then I would just, for the balance, I would stand on our briefs, and I would give the rest of my time to my co-respondents. Thank you. Mr. Mueller. Good morning, Your Honors. If it please the court, I'm George Mueller. I represent Environmental Recycling and Disposal Services. To touch briefly on the notice issue again, the appellants want to graft a requirement on a statute that isn't there. And it's not the judiciary's job to rewrite legislation. It's their job to interpret it. We've described the nature of the activity.  Have you accurately described the nature of the activity? Well, actually, that's a point that I'm getting to because I think we have. The sum and substance of the application and the testimony is, as Justice Schmitt nailed it, that the applicant wants to do 200 tons per day but has designed a facility that can safely manage 600 or possibly more. And the reason for that is because of the concept of margin for error. If you can safely do 600 tons per day, then the conclusion that 200 tons per day will not present any problems becomes pretty obvious. And that's what the sum and substance of the application and the testimony is. The applicant never said, I want to do 1,000 tons per day. I want to do 600. I want to do 700. He said, we intend to get about 200 tons per day. We can safely do more, but 200 is our intention. So, I think it's consistent and accurate all the way through. And, by the way, the village council, in approving the application, limited us to 300 tons per day, which the PCB found substantially cured any potential problem. Mr. Moran's statement that this case law requires absolutely strict instruction, I think, is a slight stretch because cases like Dawes and Bishop and Tate all allow for wiggle room and basically say the idea is to put people on notice of an upcoming hearing. Here we file a notice 14 days before the application is filed. Then the application is filed and left on file for public review for 90 days. There's a second notice filed prior to the public hearing. If people weren't on notice, then they weren't looking. Certainly, Waste Management was looking. Certainly, Will County was looking. Certainly, the City of Joliet was looking. And the City of Joliet is right next door. They appeared and said, this is fine. So, the people who were interested were all there. And, lastly, the hearing officer recessed this hearing on the first day, declaring that the application had been amended, and then recessed it for a full additional 90 days. Hearing on an amended application does not require new notice, and, therefore, the issue of whether the variance, if any, in volume is problematic is cured by the fact that the hearing officer recessed the hearing for 90 days due to what he considered to be an amendment of substantive material. Thank you. Any questions? Thank you very much. Thank you. Mr. Stiff? Good morning. I'm Steve Stifford. I think we've talked enough about some of the issues. I just wanted to talk about the village's standpoint, since we were the actual siting authority. Section 39.2 of the Act makes the village the local siting authority and the decision maker in this case. It's the village's exclusive process to weigh the evidence, make credibility determinations, and resolve any conflicts in that evidence. Over a four-day public hearing, that's exactly what the village did when it adopted Ordinance 1026, which then was appealed to the Pollution Control Board. Now, not only did the village have the ultimate decision-making authority, but the unambiguous language of the Act also allows the siting authority to include any conditions on the siting approval that may be necessary to accomplish the purpose. That's the explicit language of 39.2E. In Ordinance 1026, Criterion 1 was addressed over three single-spaced pages where the village made explicit findings, credibility determinations, and weighed any conflicts in the evidence that came out during the public hearing over the four days. On Criterion 2, it devoted almost one-and-a-half pages to single-spaced findings and then imposed certain conditions. On Criterion 5, it's about a half-page, and it also includes various conditions. Simply because Waste Management thinks their experts were better doesn't make the village's findings improper. It doesn't obviate their ability to make those credibility determinations, and it certainly, when it goes to the Pollution Control Board, to say that it was merely a rubber stamp, as Ms. Quinn pointed out, a 40-page decision from the Pollution Control Board, where they explicitly found, rather than reciting the village's findings, they explicitly found, in many respects, that the village's findings are supported by the evidence in the record. And that's their job, is to determine whether any other body could possibly not find any reasonable reason that the village's findings were inaccurate or against the manifest weight. The contention that by imposing the condition somehow makes it a new application and that it has now been amended a third time, I think, is completely not borne out by any of the cases. It's a kind of novel issue, but I think that by the specific nature and language of 39.2E, the conditions that were imposed in this case, as found by the Pollution Control Board, were reasonable and necessary, and as pointed out by Mr. Mueller, did address some of the concerns that were pointed out by the opponents in the public hearing. And again, just to reiterate, all of the interested people and parties were present at the four days of public hearing and were allowed more than their fair opportunity to have their own witnesses heard and their credibility of their witnesses weighed by the village board. I have a couple of observations. I keep hearing this recurring theme of the IPCB decision was 40 pages. I have had law clerks in the past that believe if they just send you a lot, it's going to be good. And just the length of the decision, I hope you're not suggesting that we're supposed to evaluate decisions based on verbosity? No. What I'm saying is to say that it was rubber stamped would be, I think, a short opinion that would simply say we approve of everything. Yeah. I would have to analyze whether it's a cut-and-paste situation where they were just taking language from one decision and rubber stamping it by incorporating it into another. So I just wanted to understand. You're not saying just because of the length of the decision. Absolutely not. I'm saying that if you look at it, they gave the way the – And we will. We'll carefully scrutinize it to make sure it's not a rubber stamp. I'm curious as to why the village found it necessary to limit the throughput to 300 tons. That seemed to be, I think, a very contentious issue. The testimony seemed to be that 200 was what they wanted, and there was evidence that no other transfer station has such a limitation. So I think what the village wanted to do was simply go with the lower amount, even though there was plenty of evidence that the 600 was something that could safely be handled. So is that cap still in effect? This facility cannot create or process more than 300 tons? That is the cap right now. I believe that the condition is that the transfer station could approach the village board later and seek to have that increased if at a later time it desired to. Does that require notice to the public? I do not believe so. Okay. You've helped me. Thank you very much. Any other questions? Thank you. Mr. Benson, you have two and a half minutes. I'm going to make just a couple of quick points. I want to go straight to the question of volume versus capacity. And if I would direct your attention to page 1642 of the record, which is Mr. Haack's PowerPoint, 600 tons per day, quote, under the anticipated incoming waste flow. That's fine. That's what they expect to have coming through to 600. As to the condition. Well, tons are weight, not volume. I'm sorry? Tons measure weight, not volume. I suppose that technically is true. But I think what we're talking about here is the more waste, the more trucks obviously it involves. Well, from a pollution standpoint, isn't it better to have an oversized facility than one running at full capacity every day? It may be. But the question is what the public is entitled to know what it's going to be. Well, didn't it say an average of 200 tons a day? Yes, but then it says it's going to be 600 is what they anticipated. Let me just ask you, if you have zero tons on day one, zero tons on day two, and 600 tons on day three, what's the average? Certainly, it's going to be 200. I don't disagree with you on that. But that's not what the evidence was. How is that misleading? Because that's not what the evidence is. That's not how they intend to operate at all. They talked about what the hours of operation are going to be and what the flow is going to be. And it's not going to be zero on two or three days in a row and then 1,200 at the end of the week. That's not what the evidence was. I mean, hypothetically you could say that, but that's not what the evidence was in this case. And to the point about what the ordinance said, the special condition, it says 300 tons per day is a cap. Yes, you can come back and ask for more. And you know what? They can approve more in excess of 600 on a simple resolution. So there's a crack in the door. Oh, a huge crack. The public isn't entitled to know. That's absolutely right. It doesn't even have to be by ordinance. It can be by resolution of the city council, a resolution, which is not going to get any notice at all. I want to talk about the one point Mr. Stiff raised about the novel issue, and that's the special conditions that were attached in the ordinance because the board found that the criteria were not met. Criteria 2 and 5, the hearing officer said, were not satisfied. And he imposed special conditions to try and bring it into compliance. The village board adopted that finding. That means they adopted the finding that criteria 2 and 5 were not met, and then they added their own special conditions. You can't add special conditions to make it compliant because look at what they did. They said the special condition is, well, if you satisfy the village manager that there will be enough traffic control, and if you satisfy the village manager that waste water will be handled so we don't have a leachate problem if there's a flood, then it's conditionally approved. There is nothing in the statute that permits that. The criteria is the minimum level that has to be met. The special conditions in the statute supplement it. You can add conditions. If you don't like that they're not complying with your conditions, you can bring a complaint in front of the PCB, but the conditions are not used to bring the application into compliance. May I have just one more moment to wrap that up? One moment. Thank you. The whole point is they punted the whole thing to the village manager. There is no public hearing that's going to decide the waste water management, operational safety, or traffic control. The condition says it's all up to the village manager now. But the village has already agreed that there's going to be an extra charge if they reach 600. Is that part of the village agreement? That's with the county. The county gets a certain amount of money after 600 tons per day come through. Anything in excess is 600 tons per day. But that suggests to me that 600 tons per day was a realistic estimation. I think that's what they wanted, certainly. So why would you say 200 in the notice? Thank you very much. We'd ask that you reverse. Mr. Moran? The Pollution Control Board prepared its 40-page written opinion because it didn't have time to examine the evidence and prepare a shorter opinion. If you look in that 40 pages, you've got about two pages where there's any discussion of whether the criteria were met. With respect to that issue, it's very critical for us to all recognize that the Supreme Court has told the Pollution Control Board the standard of review and the method of review you apply to these siting appeals. That includes applying your technical expertise in examining the record. That means the evidence has to be examined from the perspective of a technically qualified Pollution Control Board member who is not simply going to look to see if that evidence somehow, in some way, relates or supports a criterion, but whether it is competent and whether it is sufficient. And that simply wasn't done here. The Pollution Control Board only recited and summarized that evidence. With respect to the argument that this transfer station provides efficiencies, of course it does. But it only does that in the situation where it can provide a service area with access to a distant landfill. If there are landfills capable of serving that service area, you don't need a transfer station to basically take waste, consolidate, and bring it a mile or two or a couple of miles to a landfill. You need a transfer station when you have to get access to that more distant landfill. Are we talking about competition? Who owns all the facilities in Will County? Anybody other than Waste Management? Yes, there are two facilities in the county that Waste Management doesn't own. Keep in mind, Your Honor, that when Will County decided to develop its solid waste management plan back in the late 90s, it made a determination that what it wanted was a single landfill to handle all of its waste. It sent out that process for bid. There were numerous companies that proposed construction and operation of a landfill within Will County. So it happens that Will County selected Waste Management as the contractor to both develop that landfill and also to identify any necessary transfer stations. As it happened, there were two transfer stations already sited and operating at the time the Prairie View landfill was proposed. The two stations I mentioned before, the Rockdale Transfer Station and the Joliet Transfer Station. Joliet Transfer Station was acquired by Waste Management. It wasn't sited by Waste Management. The Rockdale Transfer Station was sited by the village of Rockdale for Waste Management, and Waste Management operated that transfer station as a municipal solid waste transfer station until just a few years ago. Time's up, counsel. Thank you very much. The only other point I'd like to make, if I could, is with regard to Criterion 8. This court set the standard for the test to analyze whether a proposed facility was consistent with the County Solid Waste Management Plan, and both the PCB, ERDS, and also both APLEES basically ignored that decision in its entirety, and there was no showing of plan consistency. Thank you for your intelligence. We thank all of you for your arguments this morning. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. The court will now stand in brief recess for a panel of change. Congratulations.